J-S22045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF E.M.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.D.E., MOTHER | : | No. 2072 WDA 2014 |

Appeal from the Order Entered November 24, 2014,
in the Court of Common Pleas of Westmoreland County,
Orphans' Court, at No(s): 163 of 2013

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.J.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.D.E., MOTHER | : | No. 2073 WDA 2014 |

Appeal from the Order Entered November 24, 2014,
in the Court of Common Pleas of Westmoreland County,
Orphans' Court, at No(s): 161 of 2013

BEFORE:  PANELLA, LAZARUS, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:               **FILED MAY 22, 2015**

E.D.E. (Mother) appeals from the orders entered November 24, 2014, in the Court of Common Pleas of Westmoreland County, which terminated involuntarily her parental rights to her two minor daughters, E.M.S. and D.J.S. (collectively, the Children).[1]  We affirm.

E.M.S. was born in June of 2010.  On August 13, 2012, E.M.S. was removed from Mother's care by Father's sister, K.S., due to Mother's drug

---

* Retired Senior Judge specially assigned to the Superior Court.

[1] The parental rights of the Children's father, D.L.S. (Father), were terminated by separate orders entered that same day.  These orders are not presently before the Court.  However, Father has filed a brief as a participant in this matter, in which he contends that Mother's parental rights should not have been terminated.

abuse. E.M.S. was adjudicated dependent by order dated December 10, 2012, and placed in the care of the Westmoreland County Children's Bureau (WCCB). Mother gave birth to D.J.S. in December of 2012. D.J.S. was born addicted to heroin and was placed in the care of WCCB immediately upon her release from the hospital. D.J.S. was adjudicated dependent by order dated February 5, 2013. Currently, the Children reside with D.S. and C.S. (collectively, the Foster Parents).

On December 30, 2013, WCCB filed petitions to terminate involuntarily Mother's parental rights to the Children. A hearing was held on November 20, 2014. On November 24, 2014, the orphans' court entered its orders terminating Mother's parental rights. Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issues for our review.

> I. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. §[]2511(a)(1)?
>
> II. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. §[]2511(a)(2)?
>
> III. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. §[]2511(a)(5)?

IV. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [M]other under 23 Pa.C.S. §[]2511(a)(8)?

V. Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S. §[]2511(b) that the best interests of the [C]hildren are met by terminating [M]other's parental rights?

Mother's brief at 4 (orphans' court answers omitted).

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if

the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated

solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court concluded that Mother has demonstrated a continued inability to parent the Children, and that Mother has shown that she is incapable of remedying this incapacity. Orphans' Court Opinion, 1/28/2015, at 7-8. The court emphasized that Mother continues to struggle with drug addiction, and that she has repeatedly been incarcerated. *Id.*

Mother contends that she has stable housing and a verifiable source of income, and that she has completed anger management, life skills, and parenting programs. Mother's brief at 11. Mother further argues that she is addressing her ongoing drug addiction issues, that she made an effort to reach out to the Children during the time she was incarcerated, and that there is a "reasonable possibility" that she will one day be able to care for the Children. *Id.* at 11-12.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights involuntarily. During the termination hearing, Ms. Jessica Nowlin testified that she was the Children's WCCB caseworker until August 13, 2014. N.T., 11/20/2014, at 86. Ms. Nowlin explained that Mother repeatedly has been incarcerated since the time the Children were placed in foster care. Specifically, Mother was incarcerated from January 28, 2013, until April 13, 2013; from May 21, 2013, until October 29, 2013; and from February 23, 2014 until "recently." *Id.* at 91-92.

Ms. Nowlin further testified that Mother has failed to remedy her drug abuse problem. Ms. Nowlin noted that Mother completed an inpatient rehabilitation program at White Deer Run after being released from incarceration in October of 2013. *Id.* at 103-04, 107. Ms. Nowlin indicated that Mother then entered an intensive outpatient treatment program at Green Briar Treatment Center, but she failed to complete this program. *Id.*

at 119-21. Mother promptly relapsed in January of 2014, and then overdosed, which resulted in her most recent incarceration. *Id.*

In addition, Ms. Nowlin reported that Mother had 12 visits with the Children during the time they were in foster care, including one visit in 2012, nine visits in 2013, and two visits in 2014. *Id.* at 87-89. Mother's first visit took place on December 20, 2012. *Id.* at 87. Mother did not have visits with the Children while she was incarcerated between January and April of 2013. *Id.* at 106. However, Mother did receive five visits while incarcerated between May and October of 2013. *Id.* Ms. Nowlin explained that these visits stopped because Mother "got in trouble in jail … and that was part of her punishment." *Id.* at 107. Mother then had five visits between November of 2013, and February of 2014.[2] *Id.* at 92, 107. Ms. Nowlin also noted that Mother sent pictures or notes to the Children on three occasions during her time as the caseworker, and that Mother sent the Children money once. *Id.* at 105.

Ms. Deborah Unferdorfer testified that she took over as the Children's caseworker after the departure of Ms. Nowlin on August 13, 2014. *Id.* at 124. Ms. Unferdorfer stated that Mother called her after she was released

---

[2] It appears that the 12th visit referenced by Ms. Nowlin was the Children's October 22, 2014 bonding evaluation. Ms. Ann Hall testified that she provided Mother with specialized supervised visitation and parenting instruction services starting in January of 2014. N.T., 11/20/2014, at 47-48. Ms. Hall explained that Mother visited with the Children on January 24, 2014, that Mother cancelled a visit scheduled for January 31, 2014, and that Mother did not visit with the Children again until the evaluation took place. *Id.* at 49-52.

from her most recent period of incarceration on October 6, 2014. *Id.* at 126. After her release, Mother reported that she was living with some "church members." *Id.* However, Mother called again on November 10, 2014, and informed Ms. Unferdorfer that one of the church members "accused her of taking her prescription medication" and Mother was now living in a motel. *Id.* at 126-27. Ms. Unferdorfer noted that Mother sent the Children notes and/or colored pictures on six occasions between August 6, 2014 and October 28, 2014. *Id.* at 132.

Pennsylvania State Trooper Charles Turik, Jr., testified that he reported to Grove City Hospital to investigate a possible drug overdose by Mother on February 21, 2014. *Id.* at 9-10. Marijuana was discovered in Mother's purse at the time she was admitted to the hospital. *Id.* at 10. Mother's personal belongings also contained 117 packets of heroin. *Id.* at 11-12. Trooper Turik explained that drug charges were filed against Mother, and that she pled guilty to possession of heroin on October 10, 2014. *Id.* at 12. Trooper Turik indicated that Mother currently is on probation. *Id.*

Mother testified that she began using drugs when she was only 12 or 13 years old, and that she has attended rehabilitation programs on four occasions. *Id.* at 170. Mother admitted that she relapsed most recently in February of 2014, after she received a payment of $80,000.[3] *Id.* at 156. Mother specified that her relapse occurred on "the day the check cleared."

---

[3] Ms. Unferdorfer reported that Mother's mother passed away, and that the $80,000 came from a life insurance policy. N.T., 11/20/2014, at 129.

*Id.* at 158. Mother indicated that she completed an intensive outpatient drug treatment program in August of 2014, while she was most recently incarcerated. *Id.* at 141-42. Mother also stated that she currently receives drug and alcohol treatment at Davis Counseling Center, and through a program called Celebrate Recovery. *Id.* at 143. However, Mother admitted that she has only attended one appointment at Davis Counseling Center, and that she missed her second appointment due to a lack of transportation.[4] *Id.* at 143-44, 164. Mother further testified that she has completed an anger management program, a parenting program, and a life skills program. *Id.* at 145, 151-52. Mother noted that she receives Supplemental Security Income, and that she leased a new apartment on November 13, 2014. *Id.* at 138-40.

Accordingly, our review of the record supports the orphans' court's conclusion that Mother is incapable of parenting the Children, and that her parental incapacity has left the Children without essential parental care or control. Additionally, it was reasonable for the court to determine that Mother will not, or cannot, remedy this incapacity. Since the Children were placed in foster care, Mother has been incarcerated repeatedly, and she has been unable to remedy her ongoing drug abuse problem. Most notably, Mother completed an inpatient drug treatment program at White Deer Run in

---

[4] Mother insisted that she now has remedied this transportation problem by signing up for the Medical Transportation Assistance Program. N.T., 11/20/2014, at 144, 147.

November of 2013, and then relapsed within a few months. While Mother completed a drug treatment program during her most recent incarceration, and while she claims that she now intends to receive treatment at Davis Counseling Center, Mother has failed to demonstrate consistent improvement. No relief is due.

Next, we consider whether termination was proper under Section 2511(b). The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

Here, the orphans' court concluded that it would be in the best interests of the Children for Mother's parental rights to be terminated. The court found that the Children are bonded with the Foster Parents, that they have no bond with Mother, and that they would not be harmed if Mother's parental rights were terminated. Orphans' Court Opinion, 1/28/2015, at 12-15. Mother argues that the bonding evaluation conducted in this case was

inadequate, because the evaluator spent only three hours with Mother and the Children. *Id.* at 13.

Again, we conclude that the record supports the orphans' court's decision to terminate Mother's parental rights. During the termination hearing, psychologist Carol Patterson testified as an expert in the field of bonding and attachment. N.T., 11/20/2014, at 22. Ms. Patterson stated that she performed bonding evaluations with respect to the Children and the Foster Parents on September 11, 2014, and with respect to the Children and Mother on October 22, 2014. *Id.* at 15. Ms. Patterson noted that her evaluation of Mother consisted of a two-hour observation period with the Children, followed by a one-hour interview. *Id.* at 33-34. Ms. Patterson explained that the Children and the Foster Parents "demonstrated a very strong bond," and that E.M.S. referred to the Foster Parents as "mom and dad." *Id.* at 19, 44-45. Ms. Patterson further noted that "it was obvious that they had been providing [the Children] a very nurturing, consistent environment and the girls seemed to be functioning very well." *Id.* at 19-20. In contrast, Ms. Patterson reported that the Children "seem to have very little recognition that [Mother] was indeed their biological mother," that D.J.S. was "almost fearful initially" during the evaluation, and that E.M.S. "presented as very wary." *Id.* at 23. Ms. Patterson observed that the Children "had negative responses to virtually all of [Mother's] actions toward them." *Id.* at 24. Ms. Patterson noted that E.M.S. kissed Mother and told

her that she loved her, but only after being asked to do so. *Id.* at 36-37. Ms. Patterson testified that the Children do not have a bond with Mother, and that they would not be harmed if Mother's parental rights were terminated. *Id.* at 29, 39, 45.

Ms. Sacha Martin testified that she is a licensed marriage and family therapist. *Id.* at 70. Ms. Martin explained that she has provided therapy to E.M.S. since 2013, though she did not recall the exact date. *Id.* at 71-72, 77, 81, 84-85. Ms. Martin first began working with E.M.S. because "she was exhibiting a variety of mental health problems" and engaging in "self-mutilative acts." *Id.* at 72. Ms. Martin noted that "when there were visitation[s] with biological parents, … the frequency of those acts would increase around that visit." *Id.* at 74. These acts finally decreased in May of 2014, after E.M.S. stopped visiting with her parents. *Id.* at 73-75.[5] Ms. Martin testified that, during the weekend following the bonding evaluation on October 22, 2014, she received a phone call from the foster mother, D.S., indicating that there had been an increase in inappropriate behaviors by E.M.S. and requesting an emergency therapy session. *Id.* at 79. These inappropriate behaviors included "destroy[ing] … a pool fence" and "kicking

---

[5] On or about May 28, 2014, WCCB filed motions requesting that visits between the Children and their parents be suspended. WCCB relied on letters drafted by Ms. Anne Hall, in which she recommended that visits cease due to "the severity of [E.M.S.'s] behavior reactions …." Letter, 5/19/2014, at 2 (unnumbered pages). The certified record contains temporary orders dated May 28, 2014, which suspended the Children's visits with Mother and Father.

bedroom furniture and walls[.]" ***Id.*** at 80-81. During the emergency session, E.M.S. displayed anger and confusion in relation to the bonding assessment, and referred to Mother as "that lady." ***Id.*** at 79-80. Ms. Martin reported that E.M.S.'s inappropriate behaviors have again decreased. ***Id.*** at 80.

Ms. Unferdorfer testified that the Children are doing "very well" in foster care, and that they call the Foster Parents "[m]om and dad." ***Id.*** at 129-30. She opined that the Children should be adopted, and that they would not suffer any harm if Mother's parental rights were terminated. ***Id.*** at 130. Ms. Nowlin also opined that the Children should be adopted. ***Id.*** at 100. She noted that the Foster Parents are "the only parents that [D.J.S.] has ever known," and that, with respect to E.M.S., the "foster home is leaps and bounds from her home of origin ...." ***Id.***

Finally, Mother testified that "I love my children and I know my children love me." ***Id.*** at 153. Mother also insisted that she and the Children "can have a bond." ***Id.*** Mother claimed that one of the Children "called me mom back in January before my visits ended, and all she wanted me to do when I saw her was hold her." ***Id.*** at 172.

Thus, the evidence supports the orphans' court's determination that it would be in the Children's best interest if Mother's parental rights were terminated. The Children are bonded with the Foster Parents, and they are doing well in foster care. In contrast, the record establishes that the

Children have no bond with Mother. While Mother complains that the bonding evaluation in this case lasted only three hours, it is clear that, under the facts of instant case, Ms. Patterson had sufficient time to observe the Children's interactions with Mother, and to conclude that they had little, if any, affection for her. Further, while Mother insists that she loves the Children, it is well-settled that "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted). Mother is not entitled to relief.[6]

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights pursuant to Sections 2511(a)(2) and (b), we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

---

[6] In her brief, Mother compares this case to *In re C.P.*, 901 A.2d 516 (Pa. Super. 2006). We note that *C.P.* is distinguishable from the instant matter, as, in that case, the trial court was not presented with any testimony concerning the impact that terminating the appellant's parental rights would have on the child. *Id.* at 521-23.

Date: <u>5/22/2015</u>